UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TAMICA J.,

Plaintiff,

                                           Case No. 1:24-cv-00622-TK

     v.

COMMISSIONER OF SOCIAL                OPINION AND ORDER
SECURITY,

Defendant.

## OPINION AND ORDER

This case is before the Court to consider a final decision of the Commissioner of Social Security which denied Plaintiff's applications for disability insurance benefits and supplemental security income. That final decision was issued by the Appeals Council on April 26, 2024.  After filing the complaint in this case, Plaintiff  moved for judgment on the pleadings (Doc. 14) and the Commissioner filed a similar motion (Doc. 18).  For the following reasons, the Court will **DENY** Plaintiff's motion for judgment on the pleadings, **GRANT** the Commissioner's motion, and **DIRECT** the Clerk to enter judgment in favor of the Defendant.

### I.  BACKGROUND

Plaintiff protectively filed her applications for benefits on August 12, 2021, alleging a disability beginning on December 16, 2020.  After initial administrative denials of her applications, Plaintiff took part in a hearing before an Administrative Law Judge on March 9, 2023.  Both Plaintiff and a vocational expert, Beth Crain, testified at the hearing.

The ALJ issued an unfavorable decision on August 25, 2023.  In that decision, the ALJ found, first, that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2024, and that she had not engaged in substantial gainful activity since her alleged onset date.  Next, the ALJ determined that Plaintiff suffered from severe impairments including mild cervical and lumbar degenerative changes, asthma, depressive disorder, generalized anxiety disorder, post traumatic stress disorder, right knee mild chondromalacia patella, history of learning disorder, right shoulder bursitis/tendinitis, and history of right Achilles ankle tendon surgery.  The ALJ further found that none of these impairments, considered singly or in combination, met or equaled the criteria for disability under the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the ability to perform a limited range of light work, concluding that she could no more than occasionally stoop, crouch, crawl, kneel, and climb ramps and stairs but that she could not climb

ladders, ropes, or scaffolds and could not balance.  Also, she could not perform overhead reaching with the right upper extremity.  She could tolerate occasional exposure to concentrated extreme cold but not hazards like dangerous machinery or unprotected heights.  From a mental point of view, she could understand, remember, and carry out simple instructions throughout an ordinary workweek with normal breaks on a sustained basis and could adapt to simple and occasional changes to the routine work setting.  Finally, she could interact occasionally and superficially with coworkers for simple work-related matters without teamwork or collaboration but could not interact with the general public.

Plaintiff had past relevant work as a coffee maker, pharmacy technician, hair braider, child monitor, and kitchen helper.  The ALJ determined, based on the testimony of the vocational expert, that Plaintiff could not perform any of those jobs, but she could do unskilled light jobs like small parts assembler, housekeeper, and shipping/receiving weigher.  She also found that those jobs existed in significant numbers in the national economy.  As a result, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act.

In her motion for judgment on the pleadings, Plaintiff raises these arguments:

1.  The Commissioner erred in substituting her own lay person's "medical" judgment for that of any psychiatrist or psychologist regarding Ms. Johnson's mental limitations.

2.  The ALJ erred in failing to individually assess the social limitations separately in interacting with supervisors, coworkers, and the public and in failing to provide substantial evidence to support limitations in each of the three groups.

Plaintiff's memorandum, Doc. 14-1, at 11, 23.

## II.  THE KEY EVIDENCE

### A.  Hearing Testimony

Plaintiff, who was 45 years old at the time of the administrative hearing, first testified that she had worked making coffee at a Tim Horton's restaurant, sorting medications in a warehouse, babysitting, braiding hair, and being a cashier at McDonald's.  She said she could no longer work due to headaches.  Plaintiff further testified that she was in a car accident in 2020 and had not driven very often since that date.  She was able to do household chores and care for her children on a daily basis.

Plaintiff said that additional medical issues that affected her ability to work included problems with her neck and back.  Those problems limited her ability to stand in one place, to walk, and to sit.  She spent a good deal of time lying down.  Plaintiff also testified to having depression and panic attacks and to being unable to reach with her arms.  Finally, she said she had trouble staying focused.

The vocational expert, Ms. Crain, described Plaintiff's past jobs as coffee maker, order filler, pharmacy technician, baker helper, hair braider, child monitor, and kitchen helper. She was then asked questions about a person with Plaintiff's vocational profile who was limited to light work with various postural and environmental restrictions. She testified that such a person could both perform Plaintiff's past work as a hair braider, order filler, and pharmacy technician, and also other unskilled light jobs like small parts assembler, housekeeper, and cafeteria attendant. When certain mental limitations were added, Ms. Crain said that they would eliminate any past work but that the person could still do the jobs of small parts assembler and housekeeper as well as a shipping and receiving weigher. No jobs would exist, however, for someone who missed two days of work per month or who was off task more than ten percent of the workday.

### B. Medical Evidence

The relevant medical records show the following. As Plaintiff notes in her memorandum, there are rather voluminous notes from her counseling sessions dating back to 2014. A representative sampling of those notes during the relevant time frame indicates that Plaintiff had been the victim of domestic violence in the past and experienced other family issues as well. She stated that while she had been violent in the past, there were no recent episodes of such violence and she generally had no concerns other than dealing with stress from raising children and managing her physical pain. She did report some mood changes following her car accident in 2020 as well as some increased fatigue and loss of appetite. Her diagnoses included major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder. She did show some improvement over the course of treatment.

In December, 2020, Plaintiff went to the emergency room the day after her accident complaining of chest, back, and right knee pain. X-rays taken at that time showed no abnormalities and she was discharged with a prescription for ibuprofen. She then sought chiropractic treatment. X-rays from January of 2021 did show loss of disc heights at C5-C6. Several months later, Plaintiff reported that she had been experiencing headaches and had chronic low back pain. An MRI of the cervical spine was recommended. That test as well as a study of the thoracic and lumbar spines was performed and showed only mild disc bulging in the lower part of the cervical spine as well as mild straightening of the lumbar lordosis. However, nerve conduction studies were positive for cervical and lumbar radiculopathy.

In August of 2021 Plaintiff was diagnosed with a right rotator cuff tear as well as some tendinitis in the right arm. She had undergone both a steroid injection and physical therapy but the shoulder pain remained. X-rays of her right knee were also negative but she was being treated for chondromalacia patella and contusion of the knee and also for sprain of the cervical and lumbar spines. At her annual physical in 2022, she was still reporting severe back pain, and straight leg raising was positive at that point. She was referred to pain management for her back.

Plaintiff's reports of back and neck pain continued into 2023. An examination done in January of that year showed decreased range of motion in the spine and some subtle weakness in

-3-

the legs.  X-rays taken at that time were essentially normal.  She said that sitting was difficult due to pain but she got some relief when standing.

### C.  Opinion Evidence

Plaintiff saw Dr. Schwab for a consultative internal medicine examination on November 10, 2021.  She did not appear to be in any distress and walked with a normal gait.  There was some limitation of motion in the lumbar spine but not the cervical spine.  Dr. Schwab's diagnoses included tobacco abuse and a history of motor vehicle accident causing right knee pain, headaches, and bilateral shoulder decreased range of motion.  He believed her to have a moderate to marked restriction in bending, lifting, carrying heavy objects, and raising her right arm above shoulder level.  (Tr. 1180-83).

Plaintiff's social worker, Ms. Strait, completed a mental impairment questionnaire on March 2, 2023.  She indicated that Plaintiff had mental health issues due in part to severe physical pain as well as to trauma which had caused depression and anxiety.  Functionally, she believed that Plaintiff could not maintain attention and concentration for two-hour intervals, would need unscheduled work breaks, could almost never interact with others, would be absent four or more days per month, and would be off task for 50% of the workday.  She also concluded that Plaintiff had multiple marked impairments in performing work-related functions.  (Tr. 1768-72).

There are also state agency evaluation in the file.  Dr. Woogen concluded that Plaintiff's mental impairments did not affect her functioning, while Dr. Stouter believed that she could do light work with various postural limitations and the limited ability to reach overhead with either arm.  Dr. Kekeon agreed that Plaintiff's psychiatric impairments were not severe, and Dr. Krist concurred with Dr. Stouter's opinion.

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted

and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012).

## IV.  DISCUSSION

### A.  ALJ's Use of Lay Judgment

As her first claim of error, Plaintiff asserts that the ALJ erred by rejecting all of the medical opinions concerning her mental functioning - two which concluded she had no severe impairment and one which imposed limitations that would be disabling - and then formulated a mental residual functional capacity which fell somewhere between these two extremes.  Plaintiff argues that the only possible basis for such a formulation was the ALJ's own lay interpretation of the raw medical data.  In support of that argument, she cites to numerous decisions holding that merely splitting the difference between competing medical opinions represents an improper method of adjudication.  In the responsive memorandum, the Commissioner contends that the ALJ's residual functional capacity assessment was properly based on an evaluation of the entire record, including not only the three medical opinions but also Plaintiff's own report of her functional capabilities both in her functional report and in the statements she made to her treating sources as well as the fact that she refused to take any medications to treat her mental conditions.

The ALJ analyzed Plaintiff's mental impairments and functional limitations in this manner.  The ALJ first reviewed Plaintiff's activities of daily living, noting that she could prepare meals, drive a car, go out alone, shop, pay bills, and spend time with others.  (Tr. 19-20). She could also care for her three children, help them with homework, and go to appointments. (Tr. 20).  The ALJ then summarized the mental health treatment records, finding that the mental status examinations generally did not reveal any evidence of abnormalities.  (Tr. 33).  Among other things, the notes indicated that Plaintiff's attention span and concentration were adequate, that her memory was good, that she declined medication for depressive symptoms, that she was often smiling, alert, and able to engage in normal conversation, that her speech varied in both speed and tone, that she often felt frustrated by events, that at times she demonstrated improvement in her mood and affect, and that she was generally alert, oriented, and cooperative. (Tr. 33-40).  The ALJ also pointed out that during the consultative physical examination, Plaintiff told Dr. Schwab that she could cook, clean, do laundry, shop, shower, and watch television.  (Tr. 41).

Next, the ALJ considered the opinions of Ms. Strait and the two state agency reviewers.

As to the former, the ALJ found the opinion to be unpersuasive, reasoning that the marked limitations which Ms. Strait included in her report were inconsistent with the treatment history and the absence of any evidence of clinical and laboratory abnormalities. She also found the state agency opinions to be only partially persuasive because they, too, were inconsistent with the evidence that Plaintiff suffered from persistent psychiatric symptoms. Based on all of these factors, the ALJ determined that Plaintiff could deal with simple instructions and adapt to simple changes in the workplace but had limited ability to interact with others.

In support of her argument, Plaintiff has cited to numerous decisions from this Court holding that, especially in cases involving mental impairments, an ALJ is not entitled to rely on her own interpretation of the raw medical data in determining the extent to which such impairments impact a claimant's ability to perform work-related functions. For example, in *Jason C. v. Comm'r of Soc. Sec.*, 2021 WL 4348742, at *4 (W.D.N.Y. Sept. 24, 2021) , this Court said:

> It is true that the medical evidence of record revealed largely normal physical findings, and that "under certain circumstances, particularly where the medical evidence shows relatively minor physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment[.]" *Gross v. Astrue*, No. 12-CV-6207P, 2014 WL 1806779, at *18 (W.D.N.Y. May 7, 2014) (quotation omitted). However, "the leeway given to ALJs to make common sense judgments does not typically extend to the determination of mental limitations, which are by their very nature highly complex and individualized." *Lilley v. Berryhill*, 307 F. Supp. 3d 157, 161 (W.D.N.Y. 2018) (quotations omitted). This is because "the effect a mental impairment has on one's ability to work is not the sort of inquiry susceptible to lay evaluation" and accordingly "[w]here serious mental illness is at issue, the ALJ may not make ... seemingly common-sense judgments about a claimant's abilities." *Stoeckel v. Comm'r of Soc. Sec.*, No. 18-CV-1475-FPG, 2019 WL 5445518, at *3 (W.D.N.Y. Oct. 24, 2019).

That does not mean, however, that it is always error for an ALJ to craft a mental residual functional capacity finding that does not exactly track one of the medical opinions in the record. This Court has also said that

> "an RFC determination, even one containing highly specific limitations, is not fatally flawed merely because it was formulated absent a medical opinion or specific limitation." *Tiffany L. v. Comm'r of Soc. Sec.*, No. 1:20-CV-0677 (WBC), 2021 WL 3145694, at *4 (W.D.N.Y. July 26, 2021) (*citing Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109-10 (2d Cir. 2020)); *see also Michael K. v. Comm'r of Soc. Sec.*, No. 1:20-cv-1467-DB, 2022 WL 3346930, at *10 (W.D.N.Y. Aug. 12, 2022) ("[J]ust because there is no explicit opinion or subjective complaint that mirrors an RFC limitation does not mean there was an error."); *Jennifer O. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1474 (WBC), 2022 WL

2718510, at *4 (W.D.N.Y. July 13, 2022) ("[A]n RFC determination, even one containing highly specific limitations, is not fatally flawed merely because it was formulated absent a medical opinion.").

*Christine K. v. Comm'r of Soc. Sec.*, 2025 WL 879971, at *5 (W.D.N.Y. Mar. 21, 2025). As the Court further observed, "what is important is that the written determination make clear how the ALJ arrived at the specific limitation to ensure it was not the result of the ALJ's speculation or conjecture." *Id*. at *6. Putting it another way, the question of whether a residual functional capacity determination that does not track any particular medical opinion is to be determined based on the specific facts of the case before the Court and requires the Court to consider if substantial evidence supports the ALJ's decision. *See also Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) *(*"It follows from these basic principles that the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence").

Here, considering the ALJ's decision in its entirety, the Court agrees with the Commissioner that the ALJ had substantial support for her residual functional capacity finding. The ALJ was partially persuaded that Plaintiff did not have particularly severe mental impairments - that was the conclusion, after all, of the state agency reviewers - but, at the same time, the ALJ had a valid basis for concluding that the assessment of Plaintiff's functional capacity made by her counselor was overly pessimistic. The record contained not only findings from the voluminous treatment records compiled by Plaintiff's counselor but also statements concerning Plaintiff's activities of daily living that showed she was capable of performing many work-related tasks despite her psychological symptoms. Plaintiff also testified that headaches were the reason she could no longer work, and there is no evidence that her prior work was impacted by any mental impairments. In limiting Plaintiff to routine, unskilled work, the ALJ reasonably accommodated her limitations, and Plaintiff has not demonstrated that she had a more restrictive functional capacity. Under these specific circumstances, and based on this particular record, the Court determines that Plaintiff's first claim of error does not justify a remand.

## B. Social Interaction Limitations

As her second claim of error, Plaintiff asserts that the ALJ did not have a proper basis for determining that Plaintiff's abilities to interact with others differed depending on whether those other people were supervisors, coworkers, or the general public. She cites to various opinions from this Court holding that in order for such a distinction to be made, it must be supported by substantial evidence in the record. *See,e.g., Joshua T. v. Comm'r of Soc. Sec.*, 2021 WL 1099614 (W.D.N.Y. Mar. 23, 2021), a case in which the Court concluded that the ALJ did not have a basis for determining that the claimant could better relate to supervisors and coworkers that to the general public because the evidence demonstrated that the claimant had been fired based on substantial disputes with supervisors and coworkers. The Commissioner counters that the record amply supports the distinction drawn by the ALJ, and cites to portions of the record indicating that Plaintiff had more issues with the general public than she did with persons of authority.

First, it is important to note that a failure to explain why the ALJ assessed a claimant with differing abilities to deal with various groups of people is not automatically grounds for reversal. *See, e.g., Joseph T. v. Comm'r of Soc. Sec.*, 2024 WL 3228055, \*4 (W.D.N.Y. June 28, 2024) ("Plaintiff maintains that remand is warranted because the ALJ failed to explain why she assessed differing capacities for interaction for these distinct groups. I disagree."). Second, the inquiry into this issue also comes down to a question of substantial evidence. Here, as the Commissioner points out, Plaintiff appeared to have an adequate ability to relate to her health care providers, physical therapists, her counselor, and other similar figures. Also, there is no indication that she encountered difficulty dealing with others in the workplace during her past employment. The ALJ credited her testimony, however, that she had difficulty when being around others in a public setting. To the extent that the record supported any significant limitations in this area - and the state agency reviewers both concluded that it did not - the ALJ did not err in imposing limitations based on the totality of the record or in differentiating between Plaintiff's ability to interact with those in the workplace and her ability to deal with the general public. Consequently, this second claim of error likewise provides no basis for ordering a remand.

## V. CONCLUSION AND ORDER

For the reasons stated above, the Court **DENIES** Plaintiff's motion for judgment on the pleadings (Doc. 14), **GRANTS** the Commissioner's motion (Doc. 18), and **DIRECTS** the Clerk to enter judgment in favor of the Defendant Commissioner of Social Security Commissioner.


**/s/ Terence P. Kemp**
**United States Magistrate Judge**

-8-